Emmett HUTTO and Perry Simmons, Plaintiffs,

v.

TEXAS INCOME PROPERTIES CORPORATION et al., Defendants.

Zelman KUEHN et al., Third-Party Plaintiffs,

v.

M. Cecil BOBBITT et al., Third-Party Defendants.

TEXAS INCOME PROPERTIES CORPORATION, Counter-Plaintiff,

v.

Emmett HUTTO and Perry Simmons, Counter-Defendants.

Civ. A. No. 72–H–853.

United States District Court,
S. D. Texas,
Houston Division.

June 16, 1976.

A. D. Dyess, Jr., Houston, Tex., for Emmett Hutto and Perry Simmons.

Robert I. White, Houston, Tex., for Texas Income Properties Corp., Zelman Kuehn, H. H. Kuehn, Leo Meyerson, Owen L. Meyerson, Samuel Meyerson, Robert Silverman.

Andrew J. Lannie, Baytown, Tex., for M. Cecil Bobbitt.

John S. Brunson, Houston, Tex., for Ronald D. Marshall.

*Memorandum and Opinion:*

SINGLETON, District Judge.

This action is brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970) and its implementing counterpart Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1975).

Plaintiffs contend that the defendants made certain material misrepresentations, in the form of misstatements and omissions, about the financial condition of Texas Income Properties Corporation (hereinafter referred to as "TIPCO") and that, as a result, plaintiff Emmett O. Hutto sold his Tower Restaurant to TIPCO in September 1969 for 14,771 shares of TIPCO stock and $153,000 in cash. At approximately the same time, plaintiff Perry Simmons paid $20,000 in cash for 2,000 shares of TIPCO stock. Defendants deny that there were any misstatements or omissions of material facts and filed a Rule 10b–5 counterclaim against Mr. Hutto claiming that he misrepresented the value of his restaurant to defendants. Third-party defendant M. Cecil Bobbitt, a certified public accountant, has been made a party to this action based on his preparation of certain financial statements for TIPCO.

TIPCO originated with the pooling of real property interests in the Baytown, Texas, area by the named defendants. In January 1969, defendants Zelman Kuehn, H. H. Kuehn, Ronald Marshall, Leo Meyerson, Robert Silverman, and Owen L. Meyerson held a controlling interest in the corporation.

## I.

Prior to submission of the case to the jury, the plaintiffs elected to take a nonsuit as to the corporate defendant TIPCO and

the individual defendant Herman Kuehn. Upon motion of plaintiff Hutto, the court directed a verdict for plaintiff on defendant's counterclaim for lack of any evidence on the record that Mr. Hutto had misrepresented the value of his restaurant to the representatives of TIPCO, there being no evidence to overcome the presumption that the value of the restaurant was any less than what a willing buyer and a willing seller agree on. Furthermore, at the close of plaintiff's case on November 12, 1975, the court granted third-party defendant M. Cecil Bobbitt's motion for a directed verdict in light of a dearth of evidence to show any liability on his part in the preparation of TIPCO's financial statements.

## II.

At the close of plaintiff's evidence on November 11, 1975, the court granted a directed verdict for three of the individual defendants: Leo Meyerson, Owen L. Meyerson, and Robert Silverman. Each of these TIPCO directors resided in and around Omaha, Nebraska, at all relevant times.

■ The standard to be applied by this court in ruling on a motion for directed verdict is clear. *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*), requires this court to find a conflict in substantial evidence before submitting any question to the jury.[1]

■ The liability of a director under Rule 10b–5 for any misrepresentations made by others in the corporation depends primarily on the level of the director's participation in the solicitation of the stock purchase.[2] The Second Circuit, after thoroughly investigating the legislative intent regarding liability of directors, concluded that the statute and rule cannot be read to require a director, solely because he is a director, to investigate each stock transaction for the veracity of every statement made. *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973).[3] Specifically referring to a failure to disclose financial information adverse to the corporation, the *Lanza* court said "a director in his capacity as director owes no duty to insure that all material, adverse information is conveyed to prospective purchasers of the stock of the corporation on whose board he sits. A director's liability to prospective purchasers under Rule 10b–5 can thus only be secondary, such as that of an aider and abettor, a conspirator, or a substantial participant in fraud perpetrated by others." *Lanza* at 1289.

1. "On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Company v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*).

2. *See generally*, Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa.L.Rev. 597 (1972).

3. The general scheme of the securities laws as applied to directors implicitly rejects any concept of strict liability for the acts of subordinates and supplants it with the realistic view that directors must, of necessity, delegate important duties. A director is entitled to rely on his subordinates in their performance of delegated responsibilities as long as that reliance is reasonable in light of all the circumstances and as long as the director has exercised due diligence in making the delegation. *See Lanza* at 1296.

■ These Omaha defendants in no way directly participated in any misrepresentations made to plaintiffs. The only evidence of any contact between one of these defendants and the plaintiffs prior to their stock purchase was a meeting in March 1969 at which the value of TIPCO stock was allegedly represented to be $12.50 per share and during which Mr. Leo Meyerson met Mr. Hutto. This alone is insufficient to impose any primary liability on Mr. Leo Meyerson. There was no evidence that this defendant personally made such a representation or that he or any other Omaha director had actual knowledge that another had done so.

It being apparent that these three directors from Omaha could not be subject to anything more than mere secondary liability, this court must now explore the extent to which Mr. Silverman and the two Mr. Meyersons may have aided and abetted a 10b–5 violation. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95 (5th Cir. 1975), recently established a three-prong test of liability as an aider and abettor to a violation of the Rule: (1) another party has committed a securities law violation, (2) the accused aider-abettor had a "general awareness that his role was part of an overall activity that is improper," and (3) he "knowingly and substantially assisted the violation." Evidence of the second and third requirements for secondary liability on the part of the Omaha defendants is conspicuously absent here.

■ With regard to a "general awareness" of participation in improper activity, the only evidence to support such a conclusion is defendant Marshall's testimony that the Omaha directors were kept generally informed about the progress being made in the solicitation of stock purchases in Baytown. There is no evidence that this communication to the remote Omaha directors ever consisted of anything which would give rise to any awareness of participation in a fraud scheme. Furthermore, lacking any participation in the scheme alleged by the plaintiffs, these directors could not be said to have "knowingly and substantially

assisted the violation." Even if the plaintiffs could have demonstrated that any of these Omaha directors failed to exercise reasonable diligence in their fiduciary responsibility in supervising the stock sales, such a failure is not of sufficient culpability to impose 10b–5 liability. There is no evidence upon which a jury could have found some culpability beyond mere negligence. *Smallwood v. Pearl Beer,* 459 F.2d 579 (5th Cir. 1974).

■ Plaintiffs argue that the Omaha directors were under a duty to disclose the true financial condition of TIPCO by issuing a retraction of a *Baytown Sun* newspaper article which reported TIPCO as a well-financed investment corporation. Notwithstanding the fact that the directors are under no special duty to insure that those soliciting stocks are not misleading potential investors, this court will not impose a duty on directors, acting only as directors, to retract an unsigned newspaper article which in no way attributes any representation to them of which they had no detailed knowledge and the nature of which would not have induced a reasonable investor into blind reliance. *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 (2d Cir. 1969).

It is clear, therefore, that there is no conflict in the substantial evidence which would have permitted this court to submit to the jury any issue of liability on the part of the Omaha directors. Because of this lack of evidence to support either primary or secondary liability, this court granted a directed verdict in favor of Leo Meyerson, Owen L. Meyerson, and Robert Silverman.

### III.

At the close of all the evidence in this case, the issues of liability and damages were submitted as to only two defendants, Ronald Marshall and Zelman Kuehn. The jury returned a verdict in favor of plaintiff Hutto against Mr. Marshall in the amount of $45,000. Plaintiff Simmons took nothing and defendant Zelman Kuehn was exonerated from any liability.

Defendant Marshall has filed a motion for judgment notwithstanding the verdict, claiming that plaintiff Hutto as a matter of law failed to perform his duty to investigate and that there was no evidence upon which the jury could differentiate between Mr. Marshall and Mr. Zelman Kuehn.

In the normal course of events leading to the sale or purchase of stock, the agreement to purchase and the actual transfer of ownership are not so far apart in time as to create the problem that faces this court. The failure of an insider to disclose material information about the value of the corporate stock he is selling is clearly a potential violation under Rule 10b–5. Generally speaking, however, if a plaintiff by the exercise of due care could discover the undisclosed material facts, any failure to so investigate relieves the defendant from his duty to disclose to the extent of the investigation. *Vohs v. Dickson,* 495 F.2d 607 (5th Cir. 1974); *Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100 (5th Cir. 1970).

Here there was a prolonged negotiation and redrafting period between the agreement to sell and the actual transfer of TIPCO stock. In January 1969 Mr. Hutto agreed to purchase TIPCO stock. His principal contact with TIPCO was through Mr. Marshall. From January to March the agreement went through a redrafting stage culminating in the signing of a contract in March and in the transfer of stock in September. The nature and timing of these events in the solicitation of the stock purchase require new and careful thinking about the relationship between a plaintiff's duty of reasonable investigation and a defendant's duty to disclose.

### (a) *Duty to Investigate*

The evidence clearly reflects that Mr. Hutto failed to undertake a reasonable investigation of TIPCO stock when he was initially contacted by Mr. Marshall. Basing much of his reliance on an unsubstantiated newspaper account of TIPCO's plans and on the oral statements of Mr. Marshall and Mr. Kuehn, Mr. Hutto never adequately inquired into the facts which could have given him a more informed view of TIPCO's financial position. Instead, he signed an investment letter stating he had undertaken all investigations he deemed necessary.

There is little doubt based on the evidence that the value of TIPCO stock in January 1969 had not declined to an extent which would indicate that the defendants misrepresented the value at that time. The problem arose because the decline in value occurred during the interval between the initial agreement and the transfer, thus making the initial representation increasingly inaccurate with the passage of time. Therefore, at the time of the agreement to purchase, a reasonable investigation by Mr. Hutto would not have revealed an actionable discrepancy in the value of the stock. Consequently, this court is unwilling to say that a failure of Mr. Hutto to reasonably investigate TIPCO in January is necessarily a bar to his recovery.

Furthermore, this court believes that a plaintiff's duty of reasonable investigation in prolonged stock transfer negotiations is not an indefinite nor continuous one. Instead, it begins with the initial contact between buyer and seller and continues only until such time as an agreement to purchase is reached or the intent of the parties is sufficiently firm as to obviate the need for plaintiff's investigation. If the period between the agreement to purchase and the final contract or transfer is an extended one, as in the case before this court, it is unreasonable to expect a plaintiff throughout this negotiation of fine details and redrafting to continuously investigate in order to assure himself that the initial representations of the seller remain accurate. Of course, the reasonable duty to investigate could reinstitute itself during this period, if plaintiff has notice of such circumstances as would reasonably warrant another investigation.

## (b) *Duty to Disclose*

■ Unlike a plaintiff's duty of reasonable investigation, a defendant's duty to disclose material adverse information should not be so limited in time. It is clear that a seller of securities has a "continuing duty" to inform prospective purchasers of adverse changes in the company's financial position. *Stier v. Smith,* 473 F.2d 1205, 1210 (5th Cir. 1973). While the duty of investigation would cease upon the reaching of an agreement to purchase, typically the duty to disclose should not end until the actual transfer of stock.

■ The fact that the seller should bear his burden of disclosure longer than plaintiff bears his duty to investigate is rooted in the very rationale for imposing a duty to disclose. The court made it clear in *Stier v. Smith* that "access to information" was the key to imposing any duty on either party to a stock transaction. 473 F.2d at 1208. Although Mr. Hutto had access to discover the value of TIPCO stock at the time of the initial agreement, the record reflects that such information was that the stock was not so far from the stated value as to call it any sort of misrepresentation. On the contrary, it was not until several months later in the negotiating period that the stock suffered its decline. At that time, after Mr. Hutto's duty to investigate had expired and Mr. Marshall's duty to disclose continued so as to require him, as the party with the access, to reveal the declining value of TIPCO stock. His failure to do so at this later time in the negotiation itself became an omission of a material fact sufficient to sustain the jury verdict.

This court, of course, realizes that there may be circumstances where a defendant's duty to disclose does not continue until the actual transfer of shares. For example, knowledge of the destruction of substantial assets or similar intervening event could cause plaintiff's duty to investigate to resurface if a reasonable investor would undertake another investigation. Furthermore, the seller might be relieved of his duty of disclosure prior to the actual trans-

fer if it became unreasonable in light of all the facts and circumstances for the buyer to maintain his expectation that material information would continue to be provided. In determining whether such circumstances exist in a particular case, a court should consider, among other relevant factors, the extent to which the parties are legally bound to the transfer, whether negotiations and redrafting have ceased and the subjective intent of the parties. Here it is unclear to what extent the parties intended Mr. Hutto to be bound in January, but it is clear that negotiations and redrafting continued for four months with a final agreement still months in future. No event during that four-month period was sufficient to signal the end of Mr. Marshall's continuing duty to disclose. His duty extended throughout the negotiation period and required him to disclose to Mr. Hutto that previous statements or representations by him are no longer valid or are now misleading in light of new information to which Mr. Marshall had access. *See Securities and Exchange Commission v. Shattuck Denn Mining Corporation,* 297 F.Supp. 470 (S.D.N.Y.1968); *Kuehnert v. Texstar Corp.,* 286 F.Supp. 340 (S.D.Tex.1968), *aff'd* 412 F.2d 700 (1969). Mr. Hutto had not, at the time the substantial decline in stock value became or should have become known to Mr. Marshall, reached the point where both parties were in an "equal position to discover the [facts]." *Vohs v. Dickson, supra* at 623.

### IV.

■ Mr. Marshall further argues that there is no evidence by which the jury could, as they did, distinguish the potential liability of Mr. Marshall from Mr. Zelman Kuehn. It is insisted that the court erred in admitting the testimony of Lucille M. Phillips, Tina Bayne, and Weldon Newby, which was critical of Mr. Marshall and that their testimony was the sole reason the jury differentiated between Mr. Kuehn and him. However, any possible prejudice was cured by the court's instruction that the testimo-

ny of these witnesses was to be considered only to the limited extent of showing Mr. Marshall's state of mind during the relevant times and not to show whether or not any misstatement was actually made to the plaintiffs. Furthermore, the record reflects that Mr. Hutto had more contacts with Mr. Marshall relative to the purchase of TIPCO stock than he did with Mr. Kuehn. Furthermore, the jury could have found from the credible evidence that Mr. Marshall had the requisite scienter which Mr. Kuehn lacked.[4]

Mr. Marshall, although a director, did not hold that position in the same sense as the Omaha directors. His involvement was too great to warrant the application of the *Lanza* and *Woodward* tests. His position was that of an insider who knew of the decline in stock value and who failed to disclose this material fact to Mr. Hutto. Mr. Marshall's duty to disclose continued past the expiration of the plaintiff's duty to investigate and required Mr. Marshall to fully disclose the adverse information.

It appears, therefore, using the applicable standard of *Boeing v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*), that defendant Marshall's motion for judgment notwithstanding the verdict should in all respected be DENIED. An order denying such motion is filed contemporaneously herewith.

---

4. In this regard, the court charged the jury as follows: "Some culpability beyond mere negligence is required . . . . What must be established is that the defendant knew the material facts were misstated or omitted and should have realized their significance in the minds of the plaintiff." Court's Charge at 9. *Vohs v. Dickson, supra; Smallwood v. Pearl Brewing Company,* 489 F.2d 579 (5th Cir. 1974); *Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir. 1974).